United States District Court
Southern District of Texas
**ENTERED**
February 22, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TRANSITO ARNULFO FLORES, | § |
| | § |
| Plaintiff, | § |
| | § |
| V. | § CIVIL ACTION NO. H-15-3462 |
| | § |
| NANCY A. BERRYHILL, ACTING | § |
| COMMISSIONER OF THE SOCIAL | § |
| SECURITY ADMINISTRATION, | § |
| | § |
| Defendant. | § |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 11), and Brief in Support (Document No. 12) and Defendant's Motion for Summary Judgment and Brief in Support. (Document No.10). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No.10) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on June 6, 2016. (Document No.9).

## I.  Introduction

Plaintiff, Transito Arnulfo Flores, ("Flores") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB").  Flores argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Gary J. Suttles, committed errors of law when he found that Flores was not disabled.  According to Flores, the ALJ, with no explanation, erroneously concluded he could communicate in English.  Flores seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. The Commissioner argues that there is substantial evidence in the record to support the ALJ's decision that Flores was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.  Administrative Proceedings

Flores protectively filed for DIB on September 27, 2012, claiming he has been disabled since May 1, 2012, due to degenerated discs in his back and high blood pressure. (Tr. 159-166).  The Social Security Administration denied his application at the initial and reconsideration stages. (Tr.96-97, 100-104, 112-115).  Thereafter, Flores requested a hearing before an ALJ.  (Tr. 116-117). The Social Security Administration granted his request, and the ALJ held a hearing on November 22, 2013.  (Tr.61-95).   On March 28, 2014, the ALJ issued a decision finding that Flores was not disabled.  (43-57).

Flores sought review by the Appeals Council of the ALJ's adverse decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are

present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council, on September 21, 2015, concluded that there was no basis upon which to grant Flores's request for review. (Tr.4-12). Thereafter, Flores requested that the denial of his request for review be re-opened, and for more time to file a civil action. On December 17, 2015, the Appeals Council denied Flores's request to reopen the Appeal's Council's denial for request for review but granted the extension of time to file a civil action. (Tr. 1-3). The ALJ's findings and decision thus became final. Flores has timely filed his appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No.10). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 11). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 415. (Document No. 5). There is no dispute as to the facts contained therein.


## III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the

decision of the Commissioner of Social Security with or without remanding the case for a rehearing"

when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine

the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d

1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues

de novo, nor substitute its judgment" for that of the Commissioner even if the evidence

preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th

Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in

the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.

1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to

be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305

U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance."

*Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found

only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d

1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If  the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his March 24, 2014, decision that Flores was not disabled.  In particular, the ALJ determined that Flores had  not engaged in substantial gainful activity since May 1, 2012, his alleged onset date; (step one); that Flores's degenerative disc disease/lumbago and hypertension were severe impairments (step two); that Flores  does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments (step three); that based on the record, Flores has the RFC to perform a sedentary work. The ALJ found that Flores has unlimited push/pull, and gross/fine dexterity, except for occasional pushing with his lower extremities, bilaterally.  The ALJ further found that Flores could occasionally bend, stoop, crouch, crawl, balance, twist, squat, and climb stairs.  Flores could not run or climb ladders, ropes or scaffolds.  He is limited to occasional exposure to heights, dangerous machinery, and uneven surfaces.  He has no mental impairments.  The ALJ , at step four, found that Flores could not perform any past relevant work.  At step five, the ALJ found that based on Flores's age (45, which is defined under the Act as a younger individual age 45-49, on the alleged disability onset date), high school education, ability to communicate in English, work experience, RFC, and the testimony of a vocational expert, that there are jobs, which exist in significant numbers in the national and regional economy, that Flores is capable of performing such as an optical goods worker,

a jewelry preparer, and a final assembler, and was not disabled within the meaning of the Act. As

a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as

testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's

educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V.  Discussion

The record shows that Flores has been treated for degenerative disc disease in his back, right

shoulder pain, and hypertension.[2] Flores has been treated by Yolanda Hamilton, M.D.  Because of

Flores's ongoing complaints of neck pain and back pain for six months, Dr. Hamilton ordered MRI

of the thoracic, lumbar, and cervical spine. (Tr. 323, 351-353, 381-382).  With respect to the lumbar

spine, the radiologist, Dr. M. Gomberawalla, opined:

> 1.  L1-L2:  There are severe degenerative disk disease, spondylosis, and osteophyte
> formations.  There is bilateral foramina stenosis, left more than right.  There are facet
> hypertrophic changes and hypertrophic ligaments in the lumbar spine.  There is mild
> central spinal stenosis with AP diameter measuring 8 mm.

---

[2] By way of background information, the record shows that Flores was injured several times during his employment at HEB Grocery Company in Houston, and received medical care for those injuries. He also received treatment for hypertension.  The earliest record shows that Flores was treated at Santa Maria Medical Clinic for allergies, hypertension and right shoulder and arm pain. (Tr. 282-285). The record shows that in January 2009, Flores injured his back in the refrigerator room when trying to move a shelf full of gallons of juices.  Flores was treated at Concentra Medical Center on January 16, 2009, January 22, 2009, January 22, 2009.  (Tr. 334-336,  340-344).  Flores was injured again in October 2009.  He was treated for groin pull at the Nova Medical Center until the end of November.  (Tr. 314, 316, 318, 320, 322).  In the summer of 2011, Flores tried to prevent a crate from falling and he injured his right hip/lower back area. (Tr. 299, 301, 304, 306, 308, 310).  In the Spring of 2012, Flores injured his right biceps.  (Tr. 288, 290, 293, 296).

2.  L2-L3:  There is degenerative disk disease and a 3 mm left paracentral annular disk bulge.  There are bilateral facet hypertrophic changes and bilateral foramina stenosis, left more than right.  There is impingement of the left exiting nerve root and neural foramen.

3.  L3-L4:  There is a 5 mm left paracentral disk protrusion indenting the left lateral recess and left side of the theca sac.  There is associated diffuse disk bulge.  There is severe central spinal stenosis. There is bilateral impingement of the exiting nerve roots and neural foramina, left more than right.  AP diameter measures 5mm.

4.  L4-L5:  There are degenerative disk disease, spondylosis, and osteophyte formations.  There are bilateral facet hypertrophic changes, right more than left.  There is bilateral foramina stenosis, right more than left.

5.  L5-S1:  There is a 4 mm right paracentral broad-based annular disk bulge. There are severe facet hypertrophic changes.  There is bilateral foramina stenosis, right more than left.  (Tr. 323, 355).

As for the images of the thoracic spine, the radiologist opined:

1.  There is degenerative disk disease and spondylosis at T11-T12.  There is a posterocentral broad-based annular disk bulge lateralizing slightly to the left at T11-T12.  There are marked facet hypertrophic changes and central spinal stenosis at T11-T12.

2.  At T8-T9, there is desiccation of the disk with degenerative spondylosis. No disk bulge, disk herniation, or spinal or foramina stenosis is seen.

3.  There is a cyst in the middle pole of the left kidney, measuring 16 mm.

4.  Moderate degenerative spondylosis is seen, and anterior osteophytes are seen at the thoracolumbar junction.  (Tr. 352).

As for the cervical spine, the radiologist opined:

1.  At C3-C4, there is desiccation of the disk and loss of height of the disk with anterior spondylosis.  There are uncovertebral hypertrophic changes with the left foramina stenosis . There is impingement of the left exiting nerve.  The right neural foramen is patent.

2.  At C4-C5, there is degenerative disk disease with 3 mm posterior central disk protrusion indenting the ventral theca sac.  There are uncovertebral hypertrophis change with bilateral foramina stenosis, left more than right.  There is central spinal stenosis with AP diameter measuring 6 mm.

3.  At C5-C6, there is 3 mm diffuse annular disk bulge.  There are bilateral

uncovertebral hypertrophic changes, bilateral foramina stenosis, and bilateral impingement of exiting nerve roots in neural foramen.

4. At C6-C7, there is diffuse posterior central annular disk bulge. There are bilateral uncovertebral hypertrophic changes and bilateral foramina stenosis, right more than left. There is impringment of the right exiting nerve root in neural foramen. (Tr. 382).

The record further shows that Dr. Hamilton referred Flores for electrophysiological testing. On May 11, 2012, Charles Marable, M.D., with Texas Neurodiagnostic Associates performed the testing. The testing revealed the following:

1. Suble electrophysiological evidence of chronic lumbar radiculopathy involving the S1 nerve roots bilaterally was recorded in the needle EMG examination of the lower extremities. Lumbar radionlopathy manifested in increased chronic reinnervation potential activity recorded in S1 enervated paraspinals and distal musculature within the lower extremities bilaterally. However, active enervation was not observed within the S1 myotomes.

2. No electrophysiological evidence of distal monosneuropathy was recorded in these electro diagnostic studies of the lower extremities. (Tr. 394, 415).

At Flores's office visit on May 11, 2012, Dr. Hamilton, based on examination findings and diagnostic testing, diagnosed Flores with cervalgia and lumbago. (Tr. 379, 380). She referred him to physical therapy. Flores had follow-up appointments with Dr. Hamilton on June 13, 2012 (Tr. 377, 378), June 21, 2012 (Tr. 375-376), July 21, 2012 (Tr. 372-374), August 21, 2012 (Tr. 370-371), September 18, 2012 (Tr. 365-369), September 28, 2012, October 5, 2012, October 12, 2012 (Tr. 364), and November 20, 2012 (Tr. 360-363). Flores attended physical therapy. (Tr. 404-412). The record reflects that Dr. Hamilton completed disability forms indicating that Flores could not sit for extended periods of time, could not lift more than ten pounds above his head or anything greater than ten pounds in general. Dr. Hamilton further restricted Flores to lifting no more than ten pounds, no climbing stairs or ladders or bending. (Tr. 395, 396).

Because of his pending application for DIB, Flores was referred for a consultative

examination with Dr. Daryl K. Daniel. (Tr. 327-329).  Dr. Daniel characterized Flores's chief complaints as degenerative disc in back and hypertension.  The results of Flores's physical examination show that Flores's blood pressure reading was 138/72.  The results relating to his back reveal:

> Back:  Noted evidence of pathological curvature to the right.  No spasm.

> Musculoskeletal:  No muscle atrophy or bone enlargement noted.  No crepitans, bony or tissue destruction, joint instability, redness, swelling or effusion.

> Neurological:  Cranial nerves II through XII, and deep tendon reflexes are grossly normal.  Sensory examination is noted to be adequate in the upper and lower extremities.  Gait is normal with no problems standing from a sitting to a standing position.  Hand grip/strength is 5/5 on the right and 5/5 on the left.  In the major muscle groups, upper extremity strength is 4/5/5 on the right and 4.5/5 on the left.  Lower extremity strength is at 4.5/5 on the right and 4.5/5 on the left.  Straight leg raises are positive at 45 degrees on the right and 45 on the left, while in the supine position.  Claimant can effectively bend over 70 degrees with an attempt to touch toes.  Claimant can walk on toes, and heels and is able to squat on today with support of exam table in the room. (Tr. 328).

X-rays of the lumbar spine taken on November 26, 2012, showed "severe scoliosis is evident, as marked multilevel chronic disc space narrowing including vacuum disc phenomena at multiple levels." (Tr. 330).  Based on the diagnostic imaging and examination, Dr. Daniel diagnosed Flores with scoliosis; lumbar disc disease, with radiculopathy, cervical disc disease, with radiculopathy. (Tr. 329).

The record shows that Flores returned to HMS Health and Wellness on December 13, 2012 (Tr. 358-359), January 19, 2013 (Tr. 357), January 31, 2013 (Tr. 403), February 1, 2013 (Tr. 402), February 7, 2013 (Tr. 401), February 14, 2013 (Tr. 400), February 22, 2013 (Tr. 399), March 7, 2013 (Tr. 354-356), March 1, 2013 (Tr. 398), July 23, 2013 (Tr. 350).  At Flores's July 23, 2013, visit, Dr. Hamilton noted that his 'L-spine tender to touch SLR + Rt leg; flex 35 degree ext 45 degree, and shoulder limited ROM and pain with movement." (Tr. 350).  Because of Flores's limited range of

motion in his shoulder, Dr. Hamilton ordered an x-ray and MRI of the right shoulder. On August

17, 2013, Flores had both diagnostic tests at Advanced Diagnostics Healthcare. The x-ray revealed

no fracture. The Glenohumeral joint and AC joints show osteoarthritis changes. (Tr. 347). The

MRI of the right shoulder revealed:

> 1.  Moderate to severe degenerative changes of the glenohumeral and AC joint are seen.
>
> 2.  Joint effusion.
>
> 3.  Complete tear of supraspinatus and infraspinatus tendons are seen with tendon retraction and muscle wasting
>
> 4.  Degenerative tear of the superior and anterior labrum are noted.
>
> 5.  Loose bodies are noted in the joint space as mentioned above. (Tr. 438-439).

Flores was next seen by Dr. Hamilton on August 27, 2013, for a blood pressure check. His blood

pressure was 140/79. (Tr. 346).

Dr. Hamilton also submitted Interrogatories on November 19, 2013, concerning Flores's

functional restrictions. Dr. Hamilton's responses were based on her treatment notes and diagnostic

imaging. (Tr. 384-385, 387-388, 390-391). Dr. Hamilton opined that Flores would need to rest

four hours out of an eight hour work day (Tr. 388), and would miss work ten days or more a month.

(Tr. 390-391).

The record also consists of two Function Reports. The Function Report dated November 6,

2012, was completed by Flores's representative, Christine Kisro. The form states: "I received help

in completing this form from my non-attorney representative." (Tr. 214). With respect to his daily

activities, he indicated that he wakes up, showers and dresses for the day, eats and goes with his wife

to take his daughter to school. He helps his wife with simple chores around the house such as

sweeping or folding laundry. Because he has difficulty bending or squatting, he is limited to what

he can do around the house or in the yard.  He attends English classes for two hours per night, four nights per week.  He has to move around the classroom to alleviate his back pain. He has difficulty dressing, and sleeping.  (Tr. 205-208, 210 ).  Social activities include spending time with his wife and children, going to the park and visiting friends on the weekend and attending church on Sunday. (Tr. 210).  Flores estimated he could lift nothing over ten pound.  He has difficulty squatting, reaching overhead, bending, standing, kneeling, walking for more than 25 minutes, and sitting for extended periods of time. (Tr. 211).

The second Function Report was completed by Flores's daughter, Wendy B. Flores, on March 1, 2013.  (Tr. 232-239).  The report is similar to the earlier report.  Flores indicated that he has problems standing or sitting for too long, bending, picking up heaving things, and walking for more than twenty minutes. (Tr. 232).  His hobbies include spending time with his family, reading, watching television and walking a few minutes every day. (Tr. 236).  He needs help with yard work. (Tr. 234). He has difficulty lifting, bending, walking, sitting, and stair climbing.  (Tr. 237).

Here, substantial evidence supports the ALJ's finding that Flores's degenerative disc disease/lumbago and hypertension were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment.

RFC is what an individual can still do despite her limitations.  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996).  The responsibility for determining a claimant's RFC is with the ALJ.  *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).  Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed  Flores's

physical impairments. The ALJ's RFC determination  is consistent with the record as a whole.  The ALJ, based on the totality of the evidence, concluded that Flores could perform sedentary work.  The ALJ found that Flores has unlimited push/pull, and gross/fine dexterity, except for occasional pushing with his lower extremities, bilaterally.  The ALJ further found that Flores can occasionally bend, stoop, crouch, crawl, balance, twist, squat, and climb stairs but cannot run or climb ladders, ropes, or scaffolds, and was limited to occasional exposure to heights, dangerous machinery, and uneven surfaces.  The ALJ gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The  second  element  considered  is  the  diagnosis  and  expert  opinions  of  treating  and examining physicians on subsidiary questions of fact.  The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455.  The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown.  *Id*. at 455-56.  The Fifth Circuit in *Newton*  described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or in otherwise unsupported by the evidence.  *Id*. at 456.  "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  *Id.* at 453.  The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are:  (1) the length of treatment relationship; (2) frequency of examination; (3)

nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinion of Dr. Hamilton. Given the proper discounting of the opinion of Dr. Hamilton concerning Flores's physical limitations, which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

**C. Subjective Evidence of Pain**

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Flores, with the assistance of a Spanish interpreter, testified about his health and its impact on his daily activities.  He offered no testimony or corroboration from her family or friends with respect to his complaints about her condition. Flores testified that that he left his job because of his back injury.  He used to stock heavy items.  (Tr. 69-70).  Flores testified that he has received minimal treatment for his back.  He had insurance when he was working but since he is unemployed has no medical insurance.  (Tr. 74-77).  He stated that a doctor had recommended surgery but he was afraid so he didn't have the surgery.  He testified that he regrets his decision.  (Tr. 74-77).  Flores

testified that he has been going to physical therapy and takes pain medication. (Tr. 76). He estimated that he could sit for twenty or twenty-five minutes but would need to shift positions. He estimated that he could stand for twenty minutes. (Tr. 77-78). Flores testified he could lift a gallon of milk. (Tr. 77). As for his activities at home, Flores testified that he spends his day laying down, for four to five hours. He watches television. He denied doing any household chores. (Tr. 78, 79, 82). He has problems sleeping. (Tr. 83). He does not shower every day. (Tr. 84). Relatives come to visit him. (Tr. 79). Flores further testified that his scoliosis has become a problem as he ages. (Tr. 81). He has gained weight due to inactivity. (Tr. 81). Flores also testified that his medication makes him nauseous and sleepy. (Tr. 81-82). In addition to his back problems, Flores testified about his neck and right shoulder pain. (Tr. 82-83).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Herman Litt, Ph.D., a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes

and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

Here, the record shows that the ALJ posed  several hypothetical questions to the VE.  The record further shows that Flores's counsel objected to the hypothetical, primarily based on the ALJ's underlying assumption that Flores "probably understands English pretty well."  (Tr. 85).  Their exchange follows:

Q.  Okay.  All right.  We've got a younger individual. He's got a high school education.  He's literate in his language.  He is a Spanish speaker.  I do find that most likely he probably understands English pretty well, but he prefers Spanish because I mean he's a citizen.

To be a citizen, you have to at least pass the English requirement.  I know that, unless you're an older person, and then they exempt you, but you have to be a certain age.

Atty:  If you're going to make these assumptions, let me ask some questions about that.

ALJ:  Let me finish my comment here.  He's been in America for almost 30 years.  You don't function working for a major corporation, I don't care if it's still in a Spanish neighborhood, and HEB is a major corporation in Texas, without having some knowledge of English, because you're going to be interacting with English speaking people.

I don't care if you're in a Spanish neighborhood, and he would not have been able to maintain his position at the level that he did, that he represented to us here today,

as a manager of the dairy department, unless he had some kind of comprehension of the English language.

That's just a fact, and you know no American corporation is going to just permit a Spanish speaker only to be employed by them for the last 20 years.  They're just not, and if you believe that, Mr. Burkhalter, I've got a bridge for you down in Brooklyn. Okay?

Atty:  I'll buy that Brooklyn bridge for you.  You need to spend some time in San Antonio or down in south Texas.

ALJ:  We're not in south Texas though.

Atty:  But HEB is a San Antonio company.

ALJ:  Well, that may be the case, but now I might accept that in south Texas, and we do a lot of cases down there, but I don't accept it in Houston.  So, you can make your inquiry of him right there.

Atty:  Sure.

Examination of the Claimant by his attorney

Q.  At HEB, did you talk to the other employees in Spanish or in English?

A.  In Spanish.

Q.  And all the workers that you worked with, did they all speak Spanish?

A.  Yes.

Q.  Were you at the same HEB the whole time?

A.  No.

Q.  The HEB that you were at the longest, where was that located?

A.  That was the last one that I worked in.  It's the Beltway 8 and Beechnut.

                    *                    *

Q.  Would you have to speak to customers in English or not?

A.  Not really.  The majority were Hispanic, and if there was a customer that needed help, and I didn't understand, I would look for help, because that was what the

company teach–taught us.  That if we cannot do it, we just go and get help.

Q.  And your supervisor spoke Spanish?

A.  The store manager was Hispanic.

Q.  Also so you had to take the citizenship test for the United States, is that correct?

A.  Yes.

Q.  And did you prepare in a certain way in order to be able to take that test?

A.  Yes.

Q.  How did you deal with the English parts of that test?

A.  Well, I went to the school there in the community to receive classes.  Two hours in the afternoon, and that's when I got help to prepare for it.

Q.  And were they teaching you only the English for the test or were they teaching you general English to be able to communicate in the community?

A.  Yes.  They taught general English.

Q.  And obviously you learned it well enough to pass the test.  Did the English stay with you?

A.  Well, the little bit that I learned, I still have it.  (Tr. 86-89)

Following this exchange, the ALJ posed the following hypothetical questions to the VE:

Q.  We've got a younger individual.  He's primarily a Spanish speaker.  I do think he understands English, but I'll do him as a Spanish speaker.  It's not going to make any difference in this case by the way.

Exertional ability to occasionally lift 20 pounds, 10 pounds frequently  Stand and walk 4 hours each.  Sit 6 of 8hours for a full 8-hour day .  His push, pull and gross, fine is unlimited, except for occasional pushing with the lower extremities bilaterally. Occasional stairs.  No ladders, ropes, scaffolds or running.  He can occasionally bend, stoop, crouch, crawl, balance, twist and squat.  Occasional exposure to heights, dangerous machinery, uneven surfaces.  He has no mental impairment.  With those elements, can he do any past work?

A.  No, Your Honor.

Q.  Do we have transferrable skills?

A.  No, sir.

Q.  Okay.  Any other jobs at that exertional level, with those restrictions?

A.  Yes, sir.  There'd be jobs such as a small products assembler.  That DOT is 739.687-030.  We have about 5,500 in the state.  205,000 nationally.

Q.  You said 5,800?

A.  I'm sorry. In the–

Q.  In the state?

A.  In the state, 205,00.

Q.  I missed it then.  I'm sorry.

A.  Yes.

Q.  And what was in the national?

A.  5,500.

Q.  You've got it reversed, right.

A.  The state is 5,500.

Q.  Okay.

A.  Yes.. The national–

Q.  And the nation?

A.  — is 205,000.

Q.  I got you.

A.  Yes.  All right.

Q.  Sorry.

A.  And then electronics worker.  DOT 726.687-010.  6,000 in the state.  210,000 nationally.

And then assembly press operator.  DOT 690.685-041.  4,500 in the state.  195,000 nationally.  These are all light, unskilled jobs, Your Honor.

Q.  Okay.  Say I reduce it down to exertional level ten, five.  That would put us at sedentary, right?

A.  Okay.

Q.  Same restrictions that remained on the other hypo one.

A.  There'd be jobs such as optical good worker.  DOT 713.684-038.  3,000 in the state.  135,000 nationally.

Jewelry preparer.  DOT 700.787-062.  4,000 in the state.  130,000 nationally. And final assembler.  DOT 713.687-018.  4,500 in the state.  175,000 nationally. These are all sedentary, unskilled jobs.

Q.  Okay.  DOT consistent?

A.  Yes, sir.  (Tr. 90-92).

The record further shows that Flores's counsel posed hypothetical questions to the VE:

Q.  If we had the same individual with the same vocational profile, age, education, and work experience, and that person had the following limitations, and for the purposes of this I'm going to use the term rare, and rare is defined as one percent to ten percent of the day.

But the individual is able to sit for a total of up to two hours a day, and that's total. Stand or walk for a total of two hours a day. Lift or carry a maximum of ten pounds, and they can do that rarely during the day.

They can rarely bend, squat, kneel or climb.  Would the individual be able to do any of the jobs you've described today?

A.  No.

Q.  Would they be able to do any competitive employment with that profile?

A.  No.

Q.  With the two profiles that were given to you today by Judge Suttles, if that individual were likely to miss more than ten days of work per month, due to their medical problems, could they still perform those jobs on a competitive basis?

A.  No.

Q.  An individual with Mr. Flores' profile, how often would they be able to miss work and still maintain the employment over an extended period?

A.  Certainly no more than two days per month.

Q.  Again returning to the two hypothetical given to you by Judge Suttles, if we added in the additional limitation for that, that the individual is going to need to lie down usually to rest for three to four hours during the eight-hour workday, would that individual be able to perform any of the jobs you've described today?

A.  They would not be able to maintain employment under those circumstances.

Q.  Not those jobs or any other jobs?

A.  Any jobs.  Yes. (Tr. 92-93).

Flores argues that substantial evidence does not support the ALJ's step five determination. Flores claims that the ALJ disregarded the evidence in the record that shows he is unable to communicate in English and, without any discussion of the record, concluded that Flores could communicate in English.[3]  Flores further argues that the ALJ's hypothetical questions were defective because they failed to reasonably incorporate his inability to communicate in English.  The Magistrate Judge agrees.

---

[3] Regarding the inability to communicate in English, 20 C.F.R. § 404.1564(b)(5) provides:

> Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor.  Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language.  Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do.  It generally doesn't matter what other language a person may be fluent in.

"Illiteracy" is defined as "the inability to read or write."  20 C.F.R. § 404.1564(b)(1).  Simply put:  "[w]e consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling."  *Id*.

Testimony that a claimant is able to speak or understand "some" English is generally insufficient to support a finding that the claimant is able to communicate in English.  *See Delacruz v. Astrue,* No. 10 Civ 05749(JGK)(MHD), 2011 WL 6425109 at *24-25 (S.D.N.Y. Dec. 1, 2011), *report and recommendation adopted ,* 2011 WL 642501 (Dec. 21, 2011).  In addition, the ability to take and pass the U.S. citizenship examination is not dispositive on the issue of plaintiff's literacy for purposes of performing other work existing in the national economy.  *see Pourdehghan v. Colvin*, No. 2:15-cv-7975, 2016 WL 4534005, at *5 (C.D.Cal. Aug. 29, 2016).  When a claimant is illiterate or unable to communicate in English, the ALJ's hypothetical question should define the claimant's educational level or English language proficiency.  *Centeno v. Astrue*, No. EP-10-CV-382-RFC, 2012 WL 728073, at *3-5 (W.D.Tex. Mar. 5, 2012).  In *Centeno*, the claimant testified via a Spanish interpreter that he was unable to read or speak English and "could not write more than his name in English."  *Id.* at *3.  The ALJ found that the claimant "was able to communicate in some English", and included this in the hypothetical questions posed to the VE. The ALJ found the claimant not disabled.  The claimant appealed to the District Court challenging the defective hypothetical.  The Court found claimant's argument about the defective hypothetical persuasive.  The Court noted that "[t]he regulations require the ALJ to evaluate a claimant's ability to speak, understand, and read and write in English when evaluating what work the claimant could perform." Because it was not clear in the record that the claimant could communicate in English, the matter was remanded.  *Id.* at *3, 5.  Flores, like the claimant in *Centeno,* testified at the hearing with the services of a Spanish translator.  He testified that he speaks only a little bit of English (Tr. 68).  He attended school in El Salvador.  He testified that he, his co-workers and supervisor communicated in Spanish, that most of the customers were Hispanic, and if there was a customer that needed help, he had been instructed to go get help.  (Tr. 88-89). He testified about preparation for the citizenship test.  Flores testified

that he went to community school for general English.  He stated, "the little bit that I learned, I still

have it."  (Tr. 89).  None of the written statements that were submitted in connection with his DIB

application were prepared by Flores.  One was completed by his representative Christine Kisro, and

the other, by his daughter.  The notices sent to Flores such as the ALJ's decision and the Appeals

Council Notice were sent in English *and* Spanish. (Tr. 3, 10-11, 40-42).  In addition, evidence

submitted to the Appeals Council, in connection with his request to re-open the denial of request for

review, indicates that Flores scored a 9 % on the Duolingo language test. The Duolingo Certificate

dated January 3, 2015, reflects that Flores is a "Beginner in English" and "can understand basic

words and phrases in the language."  (Tr. 263).[4] Upon this record, substantial evidence does not

support the ALJ's finding that Flores can communicate in English.  Because the ALJ did not address

the substantial information that indicates that Flores is unable to communicate in English, and

because whether Flores can communicate in English is determinative of whether Grid Rule 201.17[5]

applies, the matter must be remanded for further development of the record.

**V.  Conclusion**

---

[4] The undersigned Magistrate Judge notes that the medical records prior to May 1, 2012, show that Flores completed forms in Spanish (Tr. 285, 341, 343, 344), and spoke Spanish to health care providers.  (Tr. 367).

[5] Grid Rule 201.17, 20 C.F.R. § 201.00(h)(1), Part 404, Subpart P, Appendix 2, provides: Accordingly, a finding of "disabled" is warranted for individuals 45-49 who:
(i) Are restricted to sedentary work,
(ii) Are unskilled or have no transferable skills,
(iii) Have no past relevant work or can no longer perform past relevant work, and
(iv) Are unable to communicate in English, or are unable to speak and understand English but are unable to read or write in English.

Based on the foregoing, and the conclusion that the ALJ erred by failing to consider all the evidence, and that the ALJ's step five determination is not supported by substantial evidence, further development of the record is necessary, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (Document No. 10), is DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 11) is GRANTED, and that this case is REMANDED to the Social Security Administration pursuant to Sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order

Signed at Houston, Texas, this 21st day of February,, 2017

Frances H. Stacy
United States Magistrate Judge